**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leo Raymond McGUIRE, and David E.
Lee, Defendants-Appellants.**

**Nos. 83–5350, 83–5351.**

United States Court of Appeals,
Sixth Circuit.

Argued July 6, 1984.

Decided Sept. 21, 1984.

Rehearing and Rehearing En Banc
Denied Nov. 9, 1984.

Robert Houlihan, Jr., Lexington, Ky., Seymour Glanzer, John T. Kotelly, argued, Peter J. Kadzik, Dickstein, Shapiro & Morin, Lisa R. McGuire, Washington, D.C., for defendants-appellants in No. 83–5350.

James Shuffett, Shuffett, Mooney, McCoy, Campbell, Leathers & Newcomer, David Shattuck, argued, Lexington, Ky., for defendants-appellants in No. 83–5351.

Louis DeFalaise, U.S. Atty., Jane Graham, Robert E. Rawlins, argued, Asst. U.S. Attys., Lexington, Ky., for plaintiff-appellee.

Before KRUPANSKY and WELLFORD, Circuit Judges, WEICK, Senior Circuit Judge.

WELLFORD, Circuit Judge.

In April, 1979, the Kentucky Housing Corporation (KHC) instituted its "Loans to Lenders Program." The program was designed to make it easier for low income people to purchase housing. KHC made approximately $54 million available to financial institutions at a rate of $6\frac{5}{8}\%$ interest, and the financial institutions, in turn, were then to loan this money to low income borrowers at $8\frac{1}{8}\%$, a very advantageous rate of interest. First National Bank of Grayson (FNBG) participated in the pro-

gram. Defendant McGuire was president and chief executive officer of FNBG, and defendant Lee was mortgage loan officer.

The government's case was directed toward proving that FNBG was successful in obtaining these funds from KHC, but did not properly reloan them out to qualified borrowers. Instead, FNBG (in the prosecution's case, under the direction of McGuire and Lee) invested the funds at a much higher rate of return (yielding 12.6% return) maturing in more than 10 years. At the end of nine months, unloaned funds were to be returned to KHC. FNBG requested and was granted a three month extension. In the final few days of that extension, FNBG made approximately 80 loans which the government contends were bogus and made solely to avoid repayment of the funds to KHC. The government contends that these actions left FNBG with $2.65 million of KHC funds which were being inappropriately used, and that FNBG was in effect illegally profiting from the procedures instituted by defendants.

The indictment, which was returned by a federal grand jury, charged defendants with conspiracy to make false entries, making false entries, and devising a scheme to defraud the KHC. Defendants were convicted after a jury trial and have appealed.

# I

Defendants first issue raised on appeal is whether the trial court was required to give a separate instruction on the issue of good faith.[1] In the instructions actually given by the judge are set out in the margin.[2] The judge clearly stressed the impor-

1. The proposed instruction stated:

The defendant has offered evidence of his good faith in making representations alleged in the indictment. Good faith is a complete defense for the crime charged. In determining whether the defendant acted in good faith or with criminal intent, the jury should consider all the facts and circumstances of the case, including evidence of similar activity. If the jury finds that the defendant acted in good faith, he should be found not guilty.

2. There are two essential elements which must be proved beyond a reasonable doubt in order to establish the offense proscribed by this law:

First. That a defendant knowingly made a false entry concerning a material fact in a book or record or statement of a national bank, insured bank or member of the Federal Reserve System, to-wit, a false and non-bona fide loan file, as charged;

Second: That a defendant made such entry willfully, with knowledge of its falsity and with the intent of defrauding or deceiving the person/persons or entities named in the indictment.

The essence of the offense is the willful making of a materially false entry with intent to defraud, and it is not necessary to prove that anyone was in fact deceived or defrauded.

To act "with intent to defraud" means to act willfully with intent to deceive or cheat, ordinarily for the purpose of causing financial loss to another or bringing about financial gain to one's self.

Making false entries and conspiring to make false entries in the books and records of a bank are serious crimes which require proof of a specific intent to injure or defraud before a defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

An act is "knowingly" done if done voluntarily and intentionally, and not because of mistake or some other innocent reason.

In order to establish that a defendant is guilty of mail fraud, the government must prove beyond a reasonable doubt that:

1. The defendant willfully and knowingly devised a scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations or promises, and

2. The defendant used the United States Postal Service by mailing, or by causing to be mailed, some matter or thing for the purpose of executing the scheme to defraud.

The words "scheme" and "artifice" include any plan or course of action intended to deceive others, and to obtain, by false or fraudulent pretenses, representations, or promises, money or property from persons so deceived.

A statement or representation is "false" or "fraudulent" within the meaning of this statute if it relates to a material fact and is known to be untrue or is made with reckless indifference as to its truth or falsity, and is made or caused to be made with intent to defraud. A statement of representation may also be "false" or "fraudulent" when it constitutes a half-truth, or effectively conceals a material fact, with intent to defraud. A "material fact" is a fact that would be important to a reasonable person in deciding whether to engage or not engage in a particular transaction.

tance of willfullness, intent, specific intent, and lack of mistake. At least one circuit, however, would apparently find this instruction insufficient. In *United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir.1981), the court held that

> Charging the jury that a finding of specific intent to defraud is required for conviction, while it may generally constitute the negative instruction, i.e., that, if the defendants acted in good faith, they could not have had the specific intent to defraud required for conviction, *does not direct the jury's attention to the defense of good faith with sufficient specificity to avoid reversible error.*

(emphasis added).

The Fifth Circuit reaffirmed its *Goss* decision in *United States v. Curry*, 681 F.2d 406 (5th Cir.1982). The actual instructions given by the judge in that trial are not discussed. The court, however, reversed the conviction, finding:

> Curry was entitled to a good faith jury instruction if there was any evidence at all to support the charge, "regardless of how weak, inconsistent or dubious the evidence of good faith may have been." *United States v. Goss*, 650 F.2d 1345.

681 F.2d at 416.

While the Fifth Circuit may have treated it somewhat differently, we view the issue as essentially a "theory of the case" question. In this circuit, we have held that it is error to fail to instruct on the defendant's theory of the case, however "[t]he trial judge [is] not required to adopt the language suggested by a defendant ...." *United States v. Garner*, 529 F.2d 962, 970 (6th Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 124 (1976); *United States v. Giacalone*, 574 F.2d 328 (6th Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978). As the Eleventh Circuit recently held:

> A criminal defendant has no right to select the particular wording of a proposed jury instruction. As long as the instruction actually given is a correct statement of the law, fairly presents the issues to the jury, and is substantially similar to the defendant's proposed instruction, the district court has great latitude in phrasing it.

*United States v. Gaines*, 690 F.2d 849, 856–57 (11th Cir.1982) (regarding an instruction on willfulness).

■ While the trial judge should have given an instruction on the defendants' "good faith" theory of the case, *see Garner, supra; Giacalone, supra*, a review of the instruction actually given, persuades us that this error on the part of the trial court was harmless beyond a reasonable doubt. The issue of good faith was clearly placed before the jury, even if those precise words were not used. "There is nothing so important about the words 'good faith' that their underlying meaning cannot otherwise be

---

To act with "intent to defraud" means to act knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

Mail fraud is a serious crime which requires proof of a specific intent to defraud before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

In each and all of these charged areas of criminal misconduct, it is necessary that the government prove beyond a reasonable doubt that the defendant concerned committed the offense with specific intent. General intent is not enough. You must find, beyond a reasonable doubt, that the concerned defendant acted with specific intent to violate the law; that is to say, he acted knowingly and voluntarily and intentionally to do an act which the law prohibits or failed to do an act the law requires.

There is no real dispute that the defendants caused many loan applications to be made, and that there were incorrect statements made in many of them. The defendants, however, presented evidence that they believed that they had a right to act as they did, and that they acted in the belief that they were within their legal rights in view of all of the circumstances as they viewed them.

Again, the matter returns to a determination by you of two main factors in your assessment of the evidence. The first, is, what was the specific intent of the defendants, McGuire and Lee, as they pursued their course of conduct.

conveyed." *New England Enterprises, Inc. v. United States*, 400 F.2d 58, 71 (1st Cir.1968), *cert. denied*, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). The instructions with regard to specific intent adequately informed the jury of the defendants' theory of the case, and properly placed the burden of proof of intent on the government.

Accordingly, we find that the failure of the trial judge to instruct the jury on the defendants' theory was harmless error.

## II

Defendants next argue that the trial court's usage of an "and/or" instruction in connection with 18 U.S.C. § 1005 sanctioned a non-unanimous verdict.

18 U.S.C. § 1005 provides in pertinent part:

> Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud ... any ... body politic ...., or to deceive ... the Comptroller of the Currency, ... or any agent or examiner appointed to examine the affairs of such bank ... [violates the statute].

The indictment in this case, however, replaced the word "or" with the word "and." In its instructions to the jury, the trial court attempted to explain that the statute requires only an intent to injure or defraud any body politic *or* to deceive the Comptroller of the Currency in the following manner:

> In the indictment, the word "and" is synonymous with the word "or." That is to say that if the United States proved to your satisfaction beyond a reasonable doubt any of the acts connected by the word "and," it has proven satisfactorily its case on that particular element.

The defendants claim that such a charge could have led the jury to convict defendants without having reached a unanimus decision. Specifically, six of the jurors might have found that defendants took their actions with intent to defraud or deceive the Comptroller, while the other six

may have found an attempt to defraud or deceive a different victim (KHC). *See United States v. Gipson*, 553 F.2d 453, 458 n. 8 (5th Cir.1977).

It should be noted, however, that the trial court, in addition to making two general instructions on the unanimity requirement, also instructed the jury that, with regard to Section 1005:

> There are two essential elements which must be proved beyond a reasonable doubt in order to establish the offense proscribed by this law:
>
> First: That a defendant knowingly made a false entry concerning a material fact in a book or record or statement of a national bank, insured bank or member of the Federal Reserve System, to-wit, a false and non-bona fide loan file, as charged;
>
> Second: That a defendant made such entry willfully, with knowledge of its falsity and with the intent of defrauding or deceiving the person/persons or entities named in the indictment.

Thus it is clear that the jury must have unanimously agreed that the defendants knowingly made false entries. The only possible lack of unanimity could stem from a disagreement as to which entity or entities a particular defendant was intending to deceive.

Defendants rely on *United States v. Gipson, supra,* which held that the jury must unanimously agree on "the *actus reus* element of the offense", because the prohibited acts involved in that case were conceptually distinct. 553 F.2d at 458. Specifically, the acts of receipt, concealment and storage are conceptually distinct from the acts of bartering, selling and disposing. *Id.* Conversely, KHC and the Comptroller, as alternate victims, do not fall into "two conceptual groupings." Several courts have refused to apply the *Gipson* rationale when the potentially devisive theories of liability are not "conceptually distinct." *See, e.g., Lampkins v. Gagnon*, 710 F.2d 374 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984); *United States v. Sutherland*, 656 F.2d 1181, 1202

(5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v. Freeman,* 619 F.2d 1112, 1118–19 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

■ Finally, in *United States v. Zeidman,* 540 F.2d 314 (7th Cir.1976), the court instructed the jury "that they must not return a guilty verdict unless they all agreed that the defendant had devised a scheme to defraud at least the creditor or the debtor." 540 F.2d 317. The defendants made the same argument set forth by the defendants in the instant case. The court held that the defendants could not "claim prejudice because they are uncertain whether the jury convicted them of defrauding the creditor or debtor. As in the case of a statute which can be violated in different ways, it is sufficient to convict if the jury believes that at least one of the acts of fraud was committed." *Id.* at 317. Accordingly, we find no ground for reversal on this issue.

### III

Defendants third issue on appeal is that the charge to the jury impermissibly amended the indictment. Defendants' argument is that they were indicted for having devised a scheme and artifice for obtaining money under false and fraudulent pretenses, but all of the proof in the government's case went to establishing a scheme to defraud KHC by not returning money previously obtained. This, they claim, was a fatal variance from the indictment returned by the grand jury. As the government points out, however, Pattern instruction 23, which was given by the court, provides:

The words "scheme" and "artifice" include any plan or course of action intended to deceive others, and to obtain, by false or fraudulent pretenses, representations, or promises, money or property from persons so deceived.

---

3. Similarly, the defendants argue that the trial judge actually modified the indictment by adding the words "to defraud." Looking at the

■ The instant case is not similar to *United States v. Jones,* 647 F.2d 696 (6th Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981), upon which defendants rely. In that case the defendants were indicted for conspiracy to make and construct an explosive device. The charge to the jury, however, permitted conviction for mere possession. Indeed, the government "failed to present any proof that the defendants made or constructed a destructive device." *Id.* at 699. The district court therefore gave a charge on conspiracy to possess. As the appellate court noted, the defendant must be informed of the crime with which he is charged, and the indictment must sufficiently apprise him of the elements, so that he will not be misled while preparing his case. *Id.* at 699 (citing *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962)). It does not appear that any similar problems face the defendants in this case. Any change made by the district court in the instant case would have nominal impact on their defense preparation.[3] *See also United States v. Beeler,* 587 F.2d 340 (6th Cir. 1978) *cert. denied* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). (discussing the purposes underlying the rule against constructive amendments).

### IV

During the presentation of their defense, defendants called W.H. Dysard, an attorney, to testify as to defendants' good faith in retaining the KHC loan money beyond June 1, 1980. Dysard testified that he was informed about the bank's participation in the KHC Loans to Lenders Program in May, 1980. He testified that he learned of the grand jury investigation, "I think in October 1980," but had been aware of "some kind of investigation" before that time. The defense was never put on notice of the existence of any prior inconsistent statement, and after cross-examination, Dysard was excused from the trial and left

indictment as a whole, as well as the instructions, it is clear that this could have had no impact on the defendants' cases.

Lexington to return to his practice in Grayson. The government subsequently called FBI Agent Goode as a rebuttal witness. Agent Goode testified as to a conversation he had with Dysard on November 19, 1980. Goode testified that Dysard had stated that he had just become aware of "the situation," and that "he didn't know anything about it." Defendants argue that the government failed to confront Dysard with this statement and therefore this case must be overruled under Federal Rule of Evidence 613(b).[4]

While defendants have noted that several courts maintained the common law tradition which required that the witness be confronted with the inconsistent statement before extrinsic evidence as to its existence is admissible, it would seem that defendants' main argument is focused on confrontation at any time. *See 3. Weinstein's Evidence* ¶ 613[04] at 613–15 (1981) (suggesting that 613(b) allows such evidence to be admitted even if not presented to the witness to be impeached before it is introduced).

█ We do not approve of the government's not informing the defendants of this evidence, which we view as a questionable trial tactic. We would note, however, that this issue relates to the credibility of a non-party witness on a collateral matter. Indeed, even the defense lawyer who cross-examined Agent Goode stated "It's not entirely inconsistent if he said he only became aware of the situation ... in November of 1980, is it?" In any event, the prosecution should have confronted the witness with this statement. Defendants, however, were offered the opportunity to call surrebuttal witnesses. Had this point been of great importance, they would have made arrangements to return Dysard to the stand but they did not do so. We do not consider this to be a matter of serious magnitude, and do not deem it to be reversible error.

## V

█ Seven character witnesses testified on behalf of defendant McGuire, both as to their personal opinion of him and his community reputation. On cross-examination, five of these witnesses were asked about their knowledge of a pending federal civil suit which charged that McGuire and others had conspired to engage in unfair trade practices. They were further asked whether, if the allegations were proved to be true, their opinion of McGuire would change. McGuire claims that this line of questioning led to reversible error. Once the defendant has "opened the door" by offering evidence as to his good character, the prosecution may rebut that evidence. *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Fed.R. Evid. 405(a). Once a defendant's reputation is in issue, the prosecution has wide latitude on cross-examination. *Michelson*, 335 U.S. at 479, 69 S.Ct. at 220. Control of the cross-examination is largely within the trial court's discretion. *Id.* at 480, 69 S.Ct. at 220.

McGuire has apparently made two inconsistent arguments. At one point he argues that none of the character witnesses were asked on direct examination to give any opinion or reputation testimony regarding the character trait for fair dealing, thus implying that the cross-examination was not real rebuttal evidence at all. At the same time, he argues that "the instant case is identical to the situation where the character witness is asked to assume that the defendant committed the offense for which the defendant is on trial." Neither argument is well founded.

█ It would be error to allow the prosecution to ask the character witness to assume defendant's guilt of the offenses for which he is then on trial. *United States v. Polsinelli*, 649 F.2d 793, 795 (10th Cir.1981); *United States v. Morgan*, 554

---

4. Fed.R.Evid. 613(b) provided in pertinent part: Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.

F.2d 31 (2d Cir.), *cert. denied*, 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977); *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir.1977). This was simply not done in this case. A common concern in cases such as this is the asking of a purported character witness whether there are rumors circulating in the community which would affect the defendant's reputation. Prosecutors may ask a witness "have you heard of this rumor or that conduct (relating to undesirable and fraudulent conduct of defendant)?" This court has suggested in such situations that a voir dire examination of the witnesses should first take place, in order to ascertain the existence of any such rumor. *United States v. Reese*, 568 F.2d 1246 (6th Cir.1977). If a rumor does exist, even if it is not based on fact, the prosecution is permitted to pursue this line of cross-examination.

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. *The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue.* Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion.[10] It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charge, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

[10] A classic example in the books is a character witness in a trial for murder. She testified she grew up with defendant, knew his reputation for peace and quiet, and that it was good. On cross-examination she was asked if she had heard that the defendant had shot anybody and, if so, how many. She answered, "three or four," and gave the names of two but could not recall the names of the others. She still insisted, however, that he was of "good character." The jury seems to have valued her information more highly than her judgment, and on appeal from conviction the cross-examination was held proper. *People v. Laudiero*, 192 N.Y. 304, 309, 85 N.E. 132. *See also People v. Elliott*, 163 N.Y. 11, 57 N.E. 103.

*Michelson, supra*, 335 U.S. at 479, 69 S.Ct. at 220 (emphasis added, footnote omitted). In the instant case, the civil charges against McGuire were a matter of public record. The case had been reported in the local newspaper, where at least some of the witnesses had seen it. Under these circumstances, we find no error in this line of questioning.

 McGuire also complains that the prosecutor improperly informed the witnesses (and therefore the jury) of the amount sought in the civil case, after an objection had been sustained. A review of the record, however, shows that the objection had been made with regard to continuing the questioning after the witness stated that he was unaware of the amount. The prosecutor, wisely, changed her questioning of later witnesses so as to ask whether they "had heard of the five million dollar lawsuit which charges ...?" We do not find this action to be a basis for a claim of error.

Finally, character witness James C. McKenzie was asked about his son's involvement with McGuire. This clearly went to a showing of bias, and was proper under Fed.R.Evid. 611(b).

### VI

██ Defendants next suggest that the trial court abused its discretion by permitting the introduction of evidence relating to loan applications not named in the indictment. Defendant Lee bases this claim of error on Fed.R.Evid. 403, which allows the court to exclude relevant evidence if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion, or waste of time. The evidence involves testimony of the large number of last-minute "May 31 borrowers" whose names were not specifically mentioned in the indictment. This evidence seems clearly relevant as it relates to the intent of the parties in their handling of the loan proceeds, and no unfair prejudice results merely from the nature of this relevant proof. We find no valid ground for reversal in respect to this assignment of error.

## VII

Defendants requested instructions that KHC approval was not final approval of the loan, and that Kentucky law permits the execution of a mortgage before acquisition of title. This issue arose because many of the May 31 borrowers testified that they did not even own the property for which the loan had been granted by FNBG, and that they did not tell the defendants they owned the property. The handwriting on these loan applications was often demonstrated to be that of Lee or McGuire. In each case there was also an executed promissory note dated May 31, indicating that the security for the note was "a mortgage of even date." No such mortgage was ever prepared, executed or filed. Further, after KHC approved certain of these loans, the applicants were never informed of that fact by the bank.

■ Defendants seem to be arguing that these applicants applied for the loan with plans to purchase property shortly thereafter. The evidence adduced at trial, however, clearly shows that most applicants had no such intention and the court's instructions, when read as a whole, sufficiently presented the defendants' position to the jury.

## VIII

■ Prior to trial the bank was dismissed as a defendant. Both sides agreed to the submission of the indictment to the jury, but the defendants did not want the reference to the bank as a defendant to be deleted. The court, however, did make that deletion. It appears that this move was designed to avoid confusing the jury. *See United States v. Maselli,* 534 F.2d 1197 (6th Cir.1976). In such a case "the trial court added nothing to the indictment and subtracted only surplusage." *United States v. Musgrave,* 483 F.2d 327 (5th Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). Striking surplusage from an indictment does not impair its validity. *Watson v. Jago,* 558 F.2d 330, 333 (6th Cir.1977). No elements of the crime were changed, nor is actual prejudice apparent, unlike *United States v. Pandilidis,* 524 F.2d 644 (6th Cir.1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 340 (1976). This not only does not constitute reversible error, it was a proper decision by the trial judge.

## IX

■ In his instructions, the trial judge told the jury that documents in bank loan files constitute "bank statements" for purposes of 18 U.S.C. § 1005.[5] During the trial, both sides had introduced expert opinion testimony on this issue. This instruction, however, may have foreclosed from jury consideration the issue of whether certain purported files, identified with defendants, were bank statements or records within the meaning of 18 U.S.C. § 1005. This was an inappropriate action. *Schwachter v. United States,* 237 F.2d 640, 644 (6th Cir.1956). We believe, however, that in light of the strong evidence of guilt on record, and inasmuch as this evidence was found where bank records are normal-

---

5. 18 U.S.C. § 1005 prohibits the making of "any false entry *in any book, report, or statement* of such bank with intent to injure or defraud ... any ... body politic ...., or to deceive ... the Comptroller of the Currency, ... or any agent or examiner appointed to examine the affairs of such bank ....
(emphasis added).

ly maintained and in view of this court's decision in *United States v. Foster,* 566 F.2d 1045 (6th Cir.1977), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1473, 55 L.Ed.2d 509 (1978), the error was harmless beyond a reasonable doubt.

## X

Defendant Lee asserts that the evidence was insufficient to sustain his conviction. When viewed in a light most favorable to the government, it is clear that Lee knew or should have known that fraudulent loans were being made wholesale over the last weekend that the money was available. As of December 8, 1978, Lee was identified as the person through whom KHC should deal with respect to the Loans to Lenders Program. Lee received the KHC documents and attended the meetings concerning the program. He was active on the final weekend in which most of the fraudulent documents were prepared. He was also apparently aware that several of the loans, upon which his name appeared, were not in accord with KHC guidelines. Lee also was the one who oversaw the submission of the fraudulent loan applications to KHC. It seems clear that a jury question was presented, and the jury had ample evidence to find him guilty. The evidence of record is clearly sufficient to uphold his conviction.

## XI

Defendants have raised other claims of error, including certain trial "ploys" of the prosecution. We believe that these issues warrant neither reversal nor prolonged discussion. In the overall context of the proceedings, the defendants were provided with a full and fair trial. The court actions deemed erroneous did not prevent defendants from fully presenting their positions and raising prepared defenses as to each charge made against them.

We AFFIRM the convictions of each of the defendants.